JOHNSON & MONTELEONE, L.L.P.
SAM JOHNSON
405 S. Eighth Street, Suite 250
Boise, Idaho 83702
Telephone: (208) 331-2100
Facsimile: (208) 947-2424
sam@treasurevalleylawyers.com

THE BRISCOE LAW FIRM, PLLC
WILLIE BRISCOE
8117 Preston Road, Suite 300
Dallas, TX 75225
Telephone: (214) 706-9314
Facsimile: (214) 706-9315
wbriscoe@thebriscoelawfirm.com

POWERS TAYLOR LLP
PATRICK POWERS
8150 N. Central Expressway
Suite 1575
Dallas, TX 75206
Telephone: (214) 239-4565
Facsimile: (214) 550-2635
patrick@powerstaylor.com

Attorneys for Plaintiff Jeffrey Adams

## UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| JEFFREY ADAMS, Derivatively on Behalf of HECLA MINING COMPANY, <br><br>　　　　　　　　　Plaintiff, <br><br>　v. <br><br>PHILLIPS S. BAKER, JR., JOHN H. BOWLES, TERRY V. ROGERS, CHARLES B. STANLEY, ANTHONY P. TAYLOR, TED CRUMLEY, GEORGE R. NETHERCUTT, JR., JAMES A. SABALA, and DAVID J. CHRISTENSEN, <br><br>　　　　　　　　　Defendants, <br>　-and- <br><br>HECLA MINING COMPANY, a Delaware corporation, <br><br>　　　　　　Nominal Defendant | Civil Action No. _____ <br><br>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT <br><br><br><br><br><br><br><br><br><br>__DEMAND FOR JURY TRIAL__ |

## NATURE OF THE ACTION

1.      This is a verified shareholder derivative action brought on behalf of nominal defendant Hecla Mining Company ("Hecla" or the "Company") against certain of its directors and officers for breaches of fiduciary duties and other violations of law.  This matter arises out of the inadequate safety controls at the Lucky Friday Mine, which ultimately caused the closure of that mine.  Defendants' breaches of duty have caused and will continue to cause severe injury to Hecla's financial position and prospects, along with substantial damages to Hecla's reputation, goodwill, and standing in the business community.  Moreover, these actions have exposed the Company to hundreds of millions of dollars in potential liability for violations of state and federal law.

2.      Hecla is the largest and lowest cash cost silver producer in the United States. While the Company also produces gold, lead, and zinc, Hecla's silver production is the Company's focal point and the source of the vast majority of its revenues.  Through its two operating mines, the Greens Creek Mine in southeast Alaska and the Lucky Friday Mine (sometimes referred to herein as "Lucky Friday") in northern Idaho, Hecla produced over 9.4 million ounces of silver in 2011 and generated revenues of approximately $334.7 million from silver sales, representing 70% of the Company's total revenues for the year.  Of the silver production, the Lucky Friday Mine produced nearly three million ounces of silver, or approximately 31% of the Company's total silver output.

3.      There has been no better time in recent history to be in the silver production business than now, as prices have more than tripled over the past six years and are projected to reach record-breaking levels in 2012.  As expected, Hecla has been a major beneficiary of this

trend, reporting record revenues and gross profits for the fiscal year ended December 31, 2011. These market conditions should have continued to be a boon for the Company.

4.     Unfortunately for the Company and its shareholders, the Company's ability to fully profit from this momentum has been gutted by the Company's fiduciaries' utterly reckless pursuit of revenues and profit at the expense of adequately addressing poor safety conditions at the Lucky Friday Mine.  As a result of the Board of Director's (the "Board") dereliction in their responsibility to maintain the Company's mines in compliance with safety criteria enforced by the Federal Mine Safety and Health Administration ("MSHA"), on January 11, 2012, Hecla announced that its Lucky Friday Mine would be closed for up to a year following a series of serious accidents and a glut of MSHA citations.

5.     Hecla's Lucky Friday Mine has a long history of citations from the MSHA. Worse, MSHA has cited the Lucky Friday Mine with an increasing frequency through 2010.  On average, the MSHA cited Lucky Friday twenty-eight times per year from 2001 to 2005. Between 2006 and 2010, this figure shot up to fifty-three times on average per year from 2006 to 2010, representing an increase of nearly 90%.  To date, *Lucky Friday has received over 630 separate citations since 2001*, illustrating the Individual Defendants' (as defined herein) consistent failure to effectively address safety issues at the Lucky Friday Mine, despite their awareness of the magnitude and duration of MSHA citations.

6.     The Individual Defendants also were aware by 2010 of much more rigorous mine safety regulations and procedures instituted by the MSHA.  In response to the tragic mining accident at Massey Energy Company's Upper Big Branch Mine on April 5, 2010, the MSHA announced special "impact inspections" at both metal and non-metal mines around the country. The Individual Defendants were put on notice of these more stringent regulations and procedures

by no later than October 19, 2010, when the MSHA issued a press release confirming the program. Finally, the Individual Defendants acknowledged the dire effect failure to conform to legal and regulatory requirements could have on the Company as a whole in the "Risk Factors" section of Hecla's Form 10-Ks filed with the U.S. Securities and Exchange Commission ("SEC").

7.  In 2011, following years of the Board flouting mine safety requirements in contravention of MSHA regulations, the consequences of the Lucky Friday Mine's safety noncompliance became tragic and costly. First, on April 15, 2011, a miner was killed in the Lucky Friday Mine when his work area collapsed. Then, on November 17, 2011, another miner was fatally injured after being buried in rubble in the Lucky Friday Mine. Most recently, on December 14, 2011, seven miners were injured and hospitalized following a rock burst in the Lucky Friday Mine. These disastrous events reflect the widespread and varying nature of the safety hazards present in the Lucky Friday Mine.

8.  The consequences of these catastrophic events have and will continue to be extremely damaging to the Company. First, in response to the April 15, 2011 incident, the MSHA recommended Hecla be *fined nearly $1 million*. Thereafter, in the wake of the December 14, 2011 incident and the subsequent special impact investigation conducted by the MSHA at the Lucky Friday Mine, *the MSHA issued a closure order for Lucky Friday and issued fifty-nine citations*. In response, the Company issued a press release on January 11, 2012, disclosing that in order to comply with the MSHA's closure order, the Lucky Friday Mine would be closed through the end of 2012. The resultant loss in silver production is expected to cost Hecla *at least $80 million to $100 million*. Most recently, on February 21, 2012, Hecla disclosed that it will cost *an additional $50 million to bring the Lucky Friday Mine into compliance* with MSHA safety regulations.

9.     The Individual Defendants were aware of the extreme risks associated with continued noncompliance with legal safety requirements by the time the MSHA issued its October 19, 2010 press release. As such, from the Individual Defendants' first subsequent public statement on October 26, 2010, until the January 11, 2012 disclosure concerning the closure of Lucky Friday, the Individual Defendants' improperly concealed that: (i) the Company was not in compliance with safety regulations at its Lucky Friday Mine; (ii) the Company had allowed sand and concrete material to improperly build up in one of the Lucky Friday Mine shafts over a period of years, creating a safety hazard; (iii) following the December closure, the Company would be unable to reestablish mining operations at the Lucky Friday Mine by February 2012; (iv) the Company improperly accounted for its contingent liabilities in violation of Generally Accepted Accounting Principles ("GAAP"); and (v) based on the foregoing, defendants lacked a reasonable basis for their positive statements about the Company's operations and its expected silver production.

10.     In the wake of the January 11, 2012 disclosure, Hecla's value plunged more than 21%, or $1.23 per share to close at $4.41 compared to the previous trading day's closing of $5.84, erasing almost $344 million in market capitalization. As a direct result of defendants' unlawful course of conduct, the Company is now the subject of two federal securities class action lawsuits filed in the U.S. District Court for the District of Idaho on behalf of investors who purchased Hecla's shares between October 26, 2010 and January 11, 2012, inclusive. The federal securities class action lawsuits expose the Company to potentially hundreds of millions of dollars in damages.

11.     The Insider Selling Defendants (as defined herein) did not let their personal wealth suffer, however, cashing out their Company holdings before the truth emerged. These

Insider Selling Defendants used their knowledge of the material, non-public information concerning Hecla to sell over $3.1 million of their personal holdings while the Company's stock was artificially inflated.

12.    Despite the Company's abysmal safety record with respect to the Lucky Friday Mine, the Individual Defendants refused to act to cure its safety issues and instead operated the mine illegally in noncompliance with safety requirements.  The Individual Defendants casted aside the duty to protect Hecla from the known and extreme risk of material adverse consequences associated with inadequate safety controls at the Lucky Friday Mine.  Plaintiff brings this action to hold the Individual Defendants accountable for the substantial damages that their actions and reckless inaction has and will continue to cause the Company.

## JURISDICTION AND VENUE

13.    Jurisdiction is conferred by 28 U.S.C. §1332.  Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interest and costs.

14.    This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

15.    Venue is proper in this Court in accordance with 28 U.S.C. §1391(a) because: (i) Hecla maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Hecla, occurred in this District; and (iv) defendants have received

substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

### Plaintiff

16.     Plaintiff Jeffrey Adams was a shareholder of Hecla at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Hecla shareholder. Plaintiff is a citizen of Pennsylvania.

### Nominal Defendant

17.     Nominal Defendant Hecla is a Delaware corporation engaged in the discovery, acquisition, development, production, and marketing of silver, gold, lead, and zinc. Hecla produces lead, zinc, and bulk concentrates, which it sells to custom smelters and unrefined gold and silver bullion bars (doré), which can be sold as doré or further refined before sale to precious metal traders. Hecla is organized and managed through two segments that encompass its operating units: the Greens Creek and Lucky Friday units. The Greens Creek Unit is located near Juneau, Alaska and produces zinc, lead, and bulk concentrates as well as gold and silver doré. The Lucky Friday unit is located in northern Idaho and produces lead and zinc concentrates. The concentrates produced at the Greens Creek and Lucky Friday units contain payable silver, zinc, and lead, and the concentrates produced at Greens Creek also contain payable gold. Hecla's principal executive offices are located at 6500 North Mineral Drive, Suite 200, Coeur d'Alene, Idaho.

### Defendants

18.     Defendant Phillips S. Baker, Jr. ("Baker") is Hecla's Chief Executive Officer and has been since May 2003; President and has been since November 2001; and a director and has been since November 2001. Baker was also Hecla's Chief Financial Officer ("CFO") from May

2001 to June 2003; Chief Operating Officer from November 2001 to May 2003; and a Vice President from May 2001 to November 2001. Baker is named as a defendant in a securities class action complaint that alleges he violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Baker knowingly, recklessly, or with gross negligence failed to maintain safety controls at the Lucky Friday Mine in compliance with safety laws and regulations, and made improper statements in the Company's press releases and public filing concerning: (i) the Company's compliance with safety regulations with respect to the Lucky Friday Mine; (ii) the Company's ability to reestablish operations at the Lucky Friday Mine by February 2012 given the safety hazards present; and (iii) the Company's accounting for contingent liabilities. While in possession of material, non-public information concerning Hecla's true business health, Baker sold 246,000 shares of his stock for $1,962,268.20 in proceeds. Hecla paid Baker the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Qualified Deferred Compensation Earnings | All Other Compensation | Total |
|------|--------|-------------|--------------|----------------------------------------|-----------------------------------------|-----------------------|-------|
| 2010 | $445,000 | $436,220 | $441,744 | $1,133,700 | $445,799 | $12,792 | $2,915,255 |

Defendant Baker is a citizen of Washington.

19.     Defendant James A. Sabala ("Sabala") is a Hecla Senior Vice President and has been since March 2008 and Hecla's CFO and has been since May 2008. Sabala is also named as a defendant in a securities class action complaint that alleges he violated Sections 10(b) and 20(a) of the Exchange Act. Sabala knowingly, recklessly, or with gross negligence failed to maintain safety controls at the Lucky Friday Mine in compliance with safety laws and regulations, and made improper statements in the Company's press releases and public filing concerning: (i) the Company's compliance with safety regulations with respect to the Lucky Friday Mine; (ii) the Company's ability to reestablish operations at the Lucky Friday Mine by

- 7 -

February 2012 given the safety hazards present; and (iii) the Company's accounting for contingent liabilities.   While in possession of material, non-public information concerning Hecla's true business health, Sabala sold 124,406 shares of his stock for $1,094,493.38 in proceeds.  Hecla paid Sabala the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Qualified Deferred Compensation Earnings | All Other Compensation | Total |
|------|--------|--------------|---------------|-----------------------------------------|-------------------------------------------|------------------------|-------|
| 2010 | $280,000 | $145,408 | $147,249 | $387,464 | $77,398 | $15,917 | $1,053,436 |

Defendant Sabala is a citizen of Idaho.

20.   Defendant John H. Bowles ("Bowles") is a Hecla director and has been since 2006.  Bowles is also Chairman of Hecla's Audit Committee and has been since at least April 2010 and a member of Hecla's Health, Safety, Environmental & Technical Committee ("HSET Committee") and has been since at least April 2010.  Bowles knowingly or recklessly failed to maintain adequate safety controls at the Lucky Friday Mine in compliance with safety laws and regulations, and made improper statements in the Company's press releases and public filing concerning: (i) the Company's compliance with safety regulations with respect to the Lucky Friday Mine; (ii) the Company's ability to reestablish operations at the Lucky Friday Mine by February 2012 given the safety hazards present; and (iii) the Company's accounting for contingent liabilities.  Further, defendant Bowles, Chairman of the Audit Committee during the relevant period, reviewed and approved improper statements and statements in violation of GAAP.  Hecla paid Bowles the following compensation as a director:

| Fiscal Year | Fees Paid In Cash | Stock Awards | Total |
|-------------|-------------------|--------------|-------|
| 2010 | $80,000 | $61,524 | $141,524 |

Defendant Bowles is a citizen of Canada.

21.     Defendant Terry V. Rogers ("Rogers") is a Hecla director and has been since 2007. Rogers is also Chairman of Hecla's HSET Committee and has been since at least February 2012, a member of that committee and has been since at least April 2010, and a member of Hecla's Audit Committee and has been since at least April 2010. Rogers knowingly or recklessly failed to maintain adequate safety controls at the Lucky Friday Mine in compliance with safety laws and regulations, and made improper statements in the Company's press releases and public filing concerning: (i) the Company's compliance with safety regulations with respect to the Lucky Friday Mine; (ii) the Company's ability to reestablish operations at the Lucky Friday Mine by February 2012 given the safety hazards present; and (iii) the Company's accounting for contingent liabilities. Further, defendant Rogers, a member of the Audit Committee During the relevant period, reviewed and approved improper statements and statements in violation of GAAP. Hecla paid Rogers the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2010 | $76,000 | $61,524 | $137,524 |

Defendant Rogers is a citizen of Idaho.

22.     Defendant Charles B. Stanley ("Stanley") is a Hecla director and has been since 2007. Stanley is also a member of Hecla's Audit Committee and has been since at least April 2010 and a member of Hecla's HSET and has been since at least April 2010. Stanley knowingly or recklessly failed to maintain adequate safety controls at the Lucky Friday Mine in compliance with safety laws and regulations, and made improper statements in the Company's press releases and public filing concerning: (i) the Company's compliance with safety regulations with respect to the Lucky Friday Mine; (ii) the Company's ability to reestablish operations at the Lucky Friday Mine by February 2012 given the safety hazards present; and (iii) the Company's accounting for contingent liabilities. Further, defendant Stanley, a member of the Audit

Committee, reviewed and approved improper statements and statements in violation of GAAP.

Hecla paid Stanley the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2010 | $64,000 | $61,524 | $125,524 |

Defendant Stanley is a citizen of Utah.

23.     Defendant Anthony P. Taylor ("Taylor") is a Hecla director and has been since 2002. Taylor is also a member of Hecla's HSET Committee and has been since at least April 2010 and was Chairman of that committee from at least April 2010 to at least March 2011. Taylor knowingly or recklessly failed to maintain adequate safety controls at the Lucky Friday Mine in compliance with safety laws and regulations, and made improper statements in the Company's press releases and public filing concerning: (i) the Company's compliance with safety regulations with respect to the Lucky Friday Mine; (ii) the Company's ability to reestablish operations at the Lucky Friday Mine by February 2012 given the safety hazards present; and (iii) the Company's accounting for contingent liabilities. While in possession of material, non-public information concerning Hecla's true business health, Taylor sold 14,724 shares of his stock for $107,311.68 in proceeds. Hecla paid Taylor the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2010 | $76,000 | $61,524 | $137,524 |

Defendant Taylor is a citizen of Nevada.

24.     Defendant Ted Crumley ("Crumley") is Hecla's Chairman of the Board and has been since May 2006 and director and has been since 1995. Crumley knowingly or recklessly failed to maintain adequate safety controls at the Lucky Friday Mine in compliance with safety laws and regulations, and made improper statements in the Company's press releases and public filing concerning: (i) the Company's compliance with safety regulations with respect to the

Lucky Friday Mine; (ii) the Company's ability to reestablish operations at the Lucky Friday Mine by February 2012 given the safety hazards present; and (iii) the Company's accounting for contingent liabilities. Hecla paid Crumley the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2010 | $114,000 | $61,524 | $175,524 |

Defendant Crumley is a citizen of Idaho.

25.    Defendant George R. Nethercutt, Jr. ("Nethercutt") is a Hecla director and has been since 2005. Nethercutt knowingly or recklessly failed to maintain adequate safety controls at the Lucky Friday Mine in compliance with safety laws and regulations, and made improper statements in the Company's press releases and public filing concerning: (i) the Company's compliance with safety regulations with respect to the Lucky Friday Mine; (ii) the Company's ability to reestablish operations at the Lucky Friday Mine by February 2012 given the safety hazards present; and (iii) the Company's accounting for contingent liabilities. Hecla paid Nethercutt the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2010 | $72,000 | $61,524 | $133,524 |

Defendant Nethercutt is a citizen of Virginia.

26.    Defendant David J. Christensen ("Christensen") was a Hecla director from August 2003 to May 2011 and from May 2002 to October 2002. Christensen was also a member of Hecla's Audit Committee from at least April 2010 to at least March 2011. Christensen knowingly or recklessly failed to maintain adequate safety controls at the Lucky Friday Mine in compliance with safety laws and regulations, and made improper statements in the Company's press releases and public filing concerning: (i) the Company's compliance with safety regulations with respect to the Lucky Friday Mine; (ii) the Company's ability to reestablish operations at the

Lucky Friday Mine by February 2012 given the safety hazards present; and (iii) the Company's accounting for contingent liabilities.  Further, defendant Christensen, a member of the Audit Committee during the relevant period, reviewed and approved improper statements and statements in violation of GAAP.  Hecla paid Christensen the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2010 | $76,000 | $61,524 | $137,524 |

Defendant Christensen is a citizen of California.

27.     The defendants identified in ¶¶18-19 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶18, 20-26 are referred to herein as the "Director Defendants."   The defendants identified in ¶¶20-23 are referred to herein as the "HSET Committee Defendants."  The defendants identified in ¶¶20-23, 26 are referred to herein as the "Audit Committee Defendants."  The defendants identified in ¶¶18, 19, 23 are referred to herein as the "Insider Selling Defendants."  The defendants identified in ¶¶18-26 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

28.     By reason of their positions as officers, directors, and/or fiduciaries of Hecla and because of their ability to control the business and corporate affairs of Hecla, the Individual Defendants owed and owe Hecla and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Hecla in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Hecla and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

29.     Each officer and director of the Company owes to Hecla and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  To discharge their duties, the officers and directors of Hecla were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of Hecla were required to, among other things:

(a)     exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b)     maintain a safe work environment;

(c)     not trade on material inside information;

(d)     exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations, and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

(e)     when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence; and

(f)     in addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

- 13 -

**Additional Duties of the HSET Committee Defendants**

30.     In addition to these duties, under the Company's Charter in effect since August 23, 2010, the HSET Committee Defendants, defendants Bowles, Rogers, Stanley, and Taylor owed specific duties to Hecla to review the Company's health, safety, and environmental policies, to review emerging health, safety, and environmental trends in legislation and regulations affecting the Company, to ensure that the Company's compliance systems are effective, and to report compliance issues and other significant matters to the Board. The HSET Committee's Charter provides in relevant part that the HSET Committee's duties and responsibilities require it to:

- Review health, safety and environmental policies;

- Review and discuss with management, any material noncompliance with health, safety or environmental laws, and management's response to such noncompliance;

- Review and discuss with management, any pending or threatened administrative, regulatory, or judicial proceedings regarding health, safety or the environment that are material to the Company;

- Insure that management monitors significant trends in health, safety and environmental legislation; and

- Receive and review updates from management regarding health, safety and environmental performance of the Company and its subsidiaries.

**Additional Duties of the Audit Committee Defendants**

31.     In addition to these duties, under the Company's Charter in effect since January 1, 2007, the Audit Committee Defendants, defendants Bowles, Christensen, Rogers, and Stanley, owed specific duties to Hecla concerning the Company's financial reporting, risk control, and legal compliance, including assessing the Company's risk and risk management, ensuring the Company's financial statements are complete and reflect appropriate accounting principles, reviewing the Company's accounting estimates and use of reserves and accruals, and reviewing

legal compliance matters and ensuring the proper systems exist to ensure that the Company's financial statements and public disclosures comply with legal requirements.  The Audit Committee Charter provides in relevant part that the Audit Committee's duties and responsibilities require it to:

- Review significant accounting and reporting issues, including recent professional and regulatory pronouncements and consider their impact on the financial statements;

- Discuss policies with respect to risk assessment and risk management with management and the independent auditor;

- Review and discuss with management and the independent auditor the Company's annual and interim financial statements and determine whether they are complete and consistent with the information known to committee members, and assess whether the financial statements reflect appropriate accounting principles;

- Review with management and the independent auditor the accounting treatment accorded significant transactions, any significant accounting issues, the development, selection and disclosure of critical accounting estimates, regulatory and accounting initiatives, and off-balance sheet structures, and the Company's use of reserves and accruals;

- Ensure that management has the proper review system in place to ensure that the Company's financial statements, reports and other financial information disseminated to governmental organizations and the public, comply with applicable legal requirements;

- Review any evidence of material violations of securities law, breach of fiduciary duty or similar violation by the Company or any Company agent disclosed to it by the Company's counsel; and

- Review legal compliance matters with the Company's counsel that could have a significant impact on the Company's financial statements

**Control, Access, and Authority**

32.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Hecla, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

33.     Because of their advisory, executive, managerial, and directorial positions with Hecla, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and growth prospects of Hecla.  While in possession of this material, non-public information, the Individual Defendants made improper representations regarding the Company, including information regarding safety controls at Hecla's Lucky Friday Mine.

34.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Hecla, and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

35.     To discharge their duties, the officers and directors of Hecla were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Hecla were required to, among other things:

(a)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial health;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(c)     maintain a safe work environment;

(d)     refrain from acting upon material, inside corporate information to benefit themselves;

- 16 -

(e)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(f)     remain informed as to how Hecla conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(g)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

**Breaches of Duties**

36.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Hecla, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company have been ratified by the remaining Individual Defendants who collectively comprised all of Hecla's Board.

37.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to maintain noncompliant safety controls at the Lucky Friday Mine in contravention of applicable laws and regulations.

The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, as a result of defendants' illegal actions and course of conduct, the Company is now facing hundreds of millions of dollars in damages and is the subject of class action lawsuits that allege violations of securities laws. As a result, Hecla has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

38.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

39.    During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) conceal the adequacy of the Company's safety controls at the Lucky Friday Mine; (ii) deceive the investing public, including shareholders of Hecla, regarding the Individual Defendants' management of Hecla's operations, especially the Lucky Friday Mine; (iii) facilitate defendants Baker, Sabala, and Taylor's illicit sale of over $3.1 million of their personally held shares while in possession of material, non-public information; and (iv) enhance the Individual Defendants' executive and directorial positions at Hecla and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

40.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants caused the Company to issue improper financial statements.

41.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

42.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

43.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## HECLA AND THE SILVER INDUSTRY

44.     Hecla is the largest and lowest cash cost silver producer in the United States. Established in 1891, Hecla and its subsidiaries discover, acquire, develop, produce, and market silver, gold, lead, and zinc. The Company produces lead, zinc, and bulk concentrates, which it sells to custom smelters and unrefined gold and silver bullion bars, which may be sold as bullion

bars or further refined before sale to precious metals traders. Though the Company has interests in various precious and base metals, the focal point of Hecla's production and the source of the vast majority of its revenues - approximately 70% in 2011 - and profits is its silver production.

45.     The Company is organized into two segments that encompass its operating units: the Greens Creek and Lucky Friday Mines. The Greens Creek Unit, located in southeast Alaska and owned and operated through various joint venture arrangements, has been in production since 1989. The Lucky Friday mine has been owned and operated by Hecla since 1958 and is a deep underground silver, lead, and zinc mine located in the Coeur d'Alene Mining District in northern Idaho. All production in the Lucky Friday mine is by underground mining methods and access to the underground workings is via an eighteen-foot diameter concrete lined shaft known as Silver Shaft.

46.     One hundred percent of Hecla's ore production, and thus all of its revenues and profit, emanates from its two mining properties, which both primarily produce silver. While smaller than its counterpart in terms of production, the Lucky Friday Mine represents a substantial portion of the Company's business. In 2011, the Lucky Friday Mine produced nearly three million ounces of silver, generated over $134 million in revenues, including approximately $105 million from silver production, and accounted for over $76 million of the Company's total gross profits. Of the Company's overall 2011 silver production, the Lucky Friday Mine accounted for approximately 31% of the Company's total silver output, and revenues from Lucky Friday's silver contributed approximately 22% to Hecla's total revenues.

47.     With 70% of its total yearly revenue generated from silver sales, the Company has benefited handsomely from the rising market prices for silver. The Company's silver sales have risen rapidly over the past five years, consistently driving Hecla's overall revenues and gross

profit to higher levels in each of the past five years. Indeed, on February 21, 2012, Hecla announced record revenues of $477.6 million and gross profit of $265 million for fiscal year 2011, representing massive increases over fiscal year 2005 revenues and gross profits of $110.2 million and $35 million, respectively. The Lucky Friday Mine's silver production, revenues, and gross profits also rose steadily from 2005 to April 2011 before long-standing dangerous conditions led to a series of catastrophic events that began interrupting production at Lucky Friday.

48.     Hecla's future outlook looked incredibly bright as a result of a stellar silver market exhibiting few signs of slowing. Silver prices have more than tripled over the past six years and are projected to reach record-breaking levels in 2012. Most recently, from 2010 to 2011, the silver price experienced a 74% increase, reaching silver price levels that had not been seen in thirty-one years.

49.     Growing strength of investor and industrial demand for silver continues to drive the market price of silver higher. In 2010, world investment in silver rose by an impressive 40% to 279.3 million ounces, resulting in a net flow into silver of $5.6 billion, nearly doubling 2009's figure. Many experts predict silver prices will continue their meteoric climb to reach new record-breaking levels in 2012. According to HSBC Securities, demand for silver will be sustained by global concerns about fiscal profligacy and the long-term sustainability of the U.S. dollar, among other factors. As a result, silver prices are projected to remain strong over the long term.

## INDIVIDUAL DEFENDANTS' KNOWLEDGE OF SUBSTANTIAL RISKS CONCERNING LUCKY FRIDAY

50.     Unfortunately, the Company's ability to fully profit from this strong market has been significantly hampered by the Board's utterly reckless pursuit of revenues and profit at the

expense of adequately addressing poor safety conditions at the Lucky Friday Mine. Despite knowledge of the Lucky Friday Mine's extensive record of MSHA citations, the heightened risk of additional and more severe citations due to the MSHA's new special impact inspections, and the material business, financial, and operating risks Hecla could face as a result of MSHA regulations, the Individual Defendants completely failed to ensure that the Lucky Friday Mine's safety systems and protocols were in compliance with legal requirements. As a result of the Board's willful or reckless disregard for the responsibility to maintain the Company's mines in compliance with safety criteria enforced by the MSHA, on January 11, 2012, Hecla announced that its Lucky Friday Mine would be closed for up to a year following a series of serious accidents and a flood of MSHA citations.

51.     Hecla's Lucky Friday Mine has a long history of citations, which had been increasing in frequency through 2010. Lucky Friday had been cited twenty-eight times on average per year from 2001 to 2005 before this figure shot up to fifty-three times on average per year from 2006 to 2010, representing an increase of nearly 90%. In total to date, *Lucky Friday has received over 630 separate citations since 2001*, illustrating the Individual Defendants' consistent failure to effectively address safety issues at the Lucky Friday Mine, despite the enormous volume and increasing frequency of MSHA citations.

52.     Also, in mid-2010, a widely publicized event occurred that would significantly alter the regulatory and oversight climate in the mining industry and ensure that mine operators such as Hecla would be subject to heightened scrutiny. On April 5, 2010, an explosion at the Upper Big Branch Mine in West Virginia killed twenty-nine miners in the worst U.S. coal mining disaster in forty years. In response, the MSHA began instituting concentrated special "impact inspections" at both metal and non-metal mines around the country. The Individual

Defendants were put on notice of these more rigorous inspections by no later than October 19, 2010, when the MSHA issued a statement that the inspections were continuing in earnest and that the MSHA had already issued numerous closure orders as a result of its findings. Notwithstanding the imminent risk posed by the MSHA's increased vigilance to inspect and cite mines operating illegally in noncompliance with safety regulations, the Individual Defendants failed to ensure that the Lucky Friday Mine had adequate safety systems and protocols in compliance with applicable legal requirements.

53.     Further, Hecla acknowledges in its annual Form 10-K that risks associated with government regulation, including "mine safety," and mining accidents could "materially adversely affect [the Company's] business, financial condition or operating results."  In the risk factor concerning government regulation contained in Hecla's Form 10-K filed on February 25, 2011, the Company even specifically provides as an example citation it received from the MSHA, which demonstrates the Individual Defendants' awareness of the serious, "materially adverse" impact noncompliance with MSHA safety regulations could have on the Company. Notably, that Form 10-K was signed by each and every one of the Individual Defendants. However, despite knowledge of the Lucky Friday Mine's extensive record of MSHA citations, the heightened risk of additional and more severe citations due to the MSHA's new special impact inspections, and the material business, financial, and operating risks Hecla could face as a result of MSHA regulations, the Individual Defendants completely failed to ensure that the Lucky Friday Mine's safety systems and protocols were in compliance with legal requirements, despite the magnitude and duration of the citations of the Lucky Friday Mine.

## TRAGEDY BEFALLS LUCKY FRIDAY AND HECLA

54.     On April 15, 2011, two miners, Larry and Michael Marek, began their shifts at the Lucky Friday Mine.  The Mareks were both production miners assigned to perform various tasks

- 23 -

to advance a stope, which is a steplike part of a mine where minerals are extracted. They fixed a spray chamber in the ventilation raise to help cool the stope and then watered down the muck in the stopes to cool the work area. Approximately one hour into their shift, Michael Marek had finished watering the muck in the east stope when he heard the ground caving in where Larry Marek was watering and felt a tremendous rush of air. As the east stope quickly filled with dust and debris, Michael Marek ran to the west side only to find the stope completely caved in.

55.     A crew was contacted for assistance to remove the fallen ground and the MSHA was notified of the accident and immediately dispatched its personnel to the mine. Rescue crews worked around the clock removing material from the ground failure location and after an extensive effort, Larry Marek's body was recovered on April 24, 2011. Larry Marek's cause of death was attributed to blunt force trauma from the rock fall, which was approximately ninety feet long, twenty feet wide, and thirty feet high.

56.     The MSHA assembled an accident investigation team on April 15, 2011, and traveled to the Lucky Friday Mine to conduct a physical inspection of the accident scene, interview employees, and review documents and work procedures relevant to the accident. The investigation of the fatal accident resulted in penalties against Hecla and a scathing investigation report released by the MSHA on December 2, 2011, in which the MSHA blamed the catastrophe on inadequate safety measures and Company negligence and cited Hecla's mining methods used in the west slope as "a departure from typical mining methods." The MSHA's report stated, in pertinent part:

> *The accident occurred because management did not have policies and procedures that provided for the safe mining of split stopes in a multi-vein deposit.* Management failed to design, install, and maintain a support system to control the ground in places where miners worked and traveled. Additionally, management failed to ensure that appropriate supervisors or other designated persons examined or tested the ground conditions where the fall occurred.

57.    Despite the scrutiny of the MSHA and the Individual Defendants' acute, continued knowledge of illegally unsafe mine conditions resulting from the fatal accident at the Lucky Friday Mine in April of 2011, Hecla continued to operate the Lucky Friday Mine illegally in noncompliance with safety regulations.  On November 17, 2011, Hecla's blatant disregard for safety resulted in the death of another miner.  Twenty-six year old Brandon Gray and a fellow miner were attempting to dislodge muck in a bin excavation when the muck they were standing on started to flow.  Brandon was wearing a safety harness attached to a self-retracting lanyard that was designed to lock and retract to prevent sudden falls.  However, the lanyard extended and did not lock before he became engulfed in the muck.  The other miner was freed immediately, treated, and released from the hospital.  Brandon Gray died at the hospital on November 19, 2011.

58.    The MSHA began an investigation into this second fatal accident on November 17, 2011.  The investigation is ongoing and thus far only a preliminary report of the accident has been released.  The November 2011 fatal accident was deemed "unrelated" to the fatal April 2011 accident, an indication of the widespread and varying nature of the safety hazards present in the Lucky Friday Mine.

59.    Less than one month after the November 2011 accident, the Lucky Friday Mine faced yet another disastrous event that injured and hospitalized seven miners and opened a third MSHA impact investigation into the Company's safety compliance.  On December 14, 2011, miners were working 5,900 feet below the surface when a rock burst occurred, injuring and hospitalizing seven miners who were working to erect a system of mesh material designed to contain such bursts.

60.    The December 14, 2011 accident resulted in the MSHA opening another special impact investigation into Lucky Friday Mine, which was conducted from December 16th to December 23rd and resulted in a multitude of citations and orders issued to the Company. Among the violations cited was a repeated failure to maintain established ground support systems throughout the mine.  In addition, the report stated that: (i) ground support fixtures in several areas had not been installed or torqued properly; (ii) shafts had not been systematically inspected, tested and maintained, and steel structures in the shaft were not kept clean of hazardous materials; (iii) multiple areas of the mine had not been provided with two separate escape ways; (iv) explosives magazines had not been constructed and located to protect miners from the risk of unintended explosions; (v) underground shop doors were improperly constructed to ensure fire protection; (vi) elevated walkways in multiple areas were not provided with substantially constructed handrails; and (vii) travel areas were not kept clean and orderly, resulting in slip, trip, and fall hazards.

61.    In addition to the litany of citations and orders, the MSHA also ordered the temporary shutdown of Lucky Friday Mine on December 15, 2011.  *"We've issued a closure order so the entire mine is shut down,"* said Amy Louviere, a spokeswoman for the agency in Washington D.C.  "We will conduct a thorough investigation and we will not allow it to reopen until we are sure it is safe."  On January 5, 2012, the MSHA issued a closure order for the Lucky Friday Mine, citing built-up material in the shaft and on January 11, 2012, the Company announced that operations at Lucky Friday Mine would not resume until early 2013.

62.    The consequences of these catastrophic events have been dire for the Company. In its report on the April 15, 2011 incident, *the MSHA accused Hecla of safety failures that led to the miner's death, concluded that the death was a result of negligence by the Company and*

- 26 -

*its personnel, and recommended nearly $1 million in fines.* The damage to Hecla would only worsen from there. Following the December 14, 2011 incident, the MSHA conducted a special impact investigation at the Lucky Friday Mine. Thereafter, following the discovery of a litany of safety violations including sand and concrete that had been leaking into one of the mine shafts for a number of years, on January 5, 2012, the MSHA issued a closure order for the Lucky Friday Mine. In all, the MSHA issued fifty-nine citations to Hecla for twenty-seven different safety violations as a result of the special impact investigation – of those twenty-seven distinct types of violations, sixteen of them represented *repeat violations for which Hecla had received a combined 171 citations over the previous decade.*

63.     While the full adverse impact on Hecla of the Individual Defendants' failure to ensure that the Lucky Friday Mine had adequate safety systems and protocols will continue to evolve, the first shoe dropped on January 11, 2012. On that date, the Company issued a press release disclosing that in order to comply with the MSHA's closure order, the Lucky Friday Mine would be closed through the end of 2012. The press release further revealed that Hecla's silver production guidance for 2012 had been reduced to 7 million ounces from 9.5 million ounces. Based on recent market prices for silver, *the damage Hecla will suffer due to lost production from the Lucky Friday Mine is projected to be at least $80 million to $100 million.*

64.     On February 21, 2012, Hecla disclosed further adverse information concerning the drastic impact the unsafe conditions at Lucky Friday will have on the Company. Specifically, Hecla reported that the MSHA had approved the Company's plan to rectify the safety issues that led to the MSHA's January 5, 2012 closure order. The plan indicates that *the Company will incur an additional $50 million in costs to bring the Lucky Friday Mine into compliance* with MSHA safety regulations.

65.     The Individual Defendants bear ultimate responsibility for these calamitous developments, as in the face of known, widespread, and significant inadequacies in Hecla's safety controls for the Lucky Friday Mine, the Individual Defendants did not institute corrective measures.  Instead, in pursuit of revenues and profit above all else, and with callous lack of respect for the safety of Hecla's miners, the Individual Defendants drove the Lucky Friday Mine to operate illegally in noncompliance with numerous legal and regulatory safety requirements. As a result of the Individual Defendants' failures to fulfill their fiduciary duties, the Company has and will be significantly damaged.

## IMPROPER STATEMENTS

66.     In conjunction with their utter disregard for the applicable safety laws and regulations and failure to run the Lucky Friday Mine in a legal, safety-compliant manner, the Individual Defendants also exposed Hecla to significant damages as a result of violations of federal securities laws.  As alleged in the federal securities class action complaints on file in the United States District Court for the District of Idaho, from October 26, 2010 to January 11, 2012 disclosure, the Individual Defendants made and caused the Company to make improper public statements and material omissions.

67.     On October 26, 2010, Hecla issued a press release entitled "Hecla Reports a 30% Increase in Cash Flow from Its Operations in Q3 Compared to the Same Period in 2009."  The Company reported net income of $19.8 million, or $0.06 diluted earnings per share ("EPS") in the third quarter of 2010.  Further, the press release included lofty growth expectations for the Lucky Friday Mine, while failing to temper such expectations based on the unsafe conditions present at Lucky Friday.  The release stated in part:

"Both Greens Creek and Lucky Friday had a good quarter and have generated more net cash from operating activities so far this year, compared to the full year of 2009, which was a record for Hecla," said Phillips S. Baker Jr., President and

Chief Executive Officer. "Our cash position, strong operating performance and district size properties in the U.S. and Mexico, position us well to fund development and capital projects, as well as take advantage of other potential opportunities that may arise."

\* \* \*

**Lucky Friday**

At the Lucky Friday mine in Idaho, silver production was 0.8 million ounces at a total cash cost of $3.38 per ounce compared to 0.9 million ounces at a total cash cost of $3.42 per ounce in the same quarter in 2009. For the first nine months of 2010, Lucky Friday produced 2.5 million ounces of silver at a total cash cost of $3.67 per ounce, compared to 2.7 million ounces of silver at a total cash cost of $5.89 in the same period the prior year.

The third quarter total cash cost decrease of $0.04 per ounce of silver compared to the same period in the prior year, was mainly due to higher lead and zinc by-product credits resulting from increased average market prices for those metals and partially offset by higher price-sensitive production costs and taxes. For the nine months ended September 30, 2010, the $2.22 decrease in total cash cost per ounce of silver compared to the same period in 2009, is attributable to higher by-product credits and partially offset by costs that are sensitive to metals price increases.

The #4 Shaft Project is progressing and *Hecla believes it could increase the mines annual silver production by approximately 50% from current levels* and could extend the mine life beyond 2030. Total estimated capital expenditures would range between $150 and $200 million, for an internal shaft descending from the 4900 level to the 7800 level. Approximately $50 million of the total capital expenditures will be spent by year end. Engineering is underway to determine the feasibility of constructing the shaft to an ultimate depth of 8800 feet.

68.     On February 24, 2011, Hecla issued a press release announcing its fourth quarter and full year 2010 financial results. The Company reported net income of $35.4 million, or $0.13 diluted EPS for the full year 2010. Further, the Company reported record fourth quarter and full year revenues and cash flows from operating activities, in part due to strong production at Lucky Friday and the Company's ability to take advantage of high metal prices to translate Lucky Friday's production into impressive financial results. The Individual Defendants,

- 29 -